Argued and submitted May 5, decision of Court of Appeals and judgment of circuit court affirmed November 19, 1992, reconsideration denied by opinion January 28, 1993
See 315 Or 308, 844 P2d 905 (1993)

Paul H. STRINGER
and Timothy D. Schubert,
*Petitioners on Review,*

*v.*

CAR DATA SYSTEMS, INC.,
an Oregon corporation;
Consumer Data Systems, Inc.,
an Oregon corporation;
James L. Adkisson; David W. Agnor;
Sharon Agnor; James L. Agnor;
Arlene L. Belanger; Peter G. Bock;
Susan D. Ebner; Mark S. Boyd;
Jeffrey Scott Carlson; Lawrence R. Custer;
Stephen J. Ebner; William A. Henry;
John H. Hodges, Sr.; Bernal Hug, Jr.;
Virginia Hug; Celas A. Hug; Kent Hug;
Cheryl Hug; Paul E. Johnson; Corleen Johnson;
Mark Anthony Royal Kallenberger;
David E. Lamb; Jacqueline C. Lamb;
Steven D. Lee; Claudia J. Lee;
Leslie R. Lock; Terry R. Lock;
Steve P. Nagel; Henry B. Shafer;
Bob Sievers, Jr.; Judy A. Sievers;
Donald Smith; Richard M. Botteri
and Weiss, Descamp & Botteri,
a professional corporation,
an Oregon professional corporation,
*Respondents on Review,*

*and*

Elizabeth A. PERRY
and James B. Kargman,
*Nominal Defendants.*

(CC A8907-04022; CA A65113; SC S38792)

841 P2d 1183

Robert J. McGaughey, of McGaughey & Georgeff, Portland, argued the cause and filed the petition for petitioners on review.

Mark A. Turner, of Ater Wynn Hewitt Dodson & Skerritt, Portland; Carolyn E. Wells, of Miller Nash Wiener Hager &

Carlsen, Portland; and Thomas W. Brown, of Cosgrave, Vergeer & Kester, Portland, argued the cause and filed a response to the petition for review on behalf of the following respondents on review: Mr. Turner, for Car Data Systems, Inc., James L. Adkisson, Celas A. Hug, Peter G. Bock, Mark S. Boyd, Kent Hug, and David E. Lamb; Ms. Wells, for Arlene Belanger, Jeffrey Scott Carlson, Lawrence R. Custer, William A. Henry, John H. Hodges, Sr., Mark Anthony Royal Kallenberger, Leslie R. Lock, Terry R. Lock, Steve P. Nagel, Bob Sievers, Jr., and Judy A. Sievers; and Mr. Brown, for Richard. M. Botteri and Weiss, Descamp & Botteri.

Glen H. Downs, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

PETERSON, J.

Unis, J., filed an opinion concurring in part and dissenting in part in which Fadeley, J., joined.

## PETERSON, J.

This case involves what courts and commentators have described as a "cash-out merger," a "squeeze-out merger," or a "freeze-out merger." In this opinion, we will use the term "cash-out merger." Under ORS 60.551 to 60.594, majority shareholders may eliminate minority shareholders of a corporation by merger procedures that allow dissenting minority shareholders to receive "fair value" for their shares.

Plaintiffs were minority shareholders in Consumer Data Systems, Inc. (CDS), an Oregon corporation. They filed this action, claiming a violation of various rights incident to a cash-out merger involving CDS and another corporation, Car Data Systems, Inc. (Car Data). Plaintiffs allege that other CDS shareholders and directors breached a fiduciary duty owed to plaintiffs as minority shareholders. They seek compensatory and punitive damages.[1] The trial court dismissed their complaint for failure to state a claim, ORCP 21A(8), and the Court of Appeals affirmed. *Stringer v. Car Data Systems, Inc.*, 108 Or App 523, 821 P2d 418, *modified on reconsideration*, 110 Or App 14, 821 P2d 418 (1991). We affirm the decision of the Court of Appeals, but on different grounds.

Before turning to the facts, a brief summary of cash-out mergers is appropriate.

At common law, each shareholder of a corporation was considered to have a "vested right" in the corporation. As a result, the rule in many jurisdictions was that a single shareholder could veto a proposed business combination. *See* Annot, *Valuation of Stock of Dissenting Shareholders in Case of Consolidation or Merger of Corporation, Sale of its Assets, or the Like*, 48 ALR3d 430, 435 (1973); *Chicago Corp. v. Munds*, 20 Del Ch 142, 172 A 452, 455 (1934).

Legislatures, courts, and commentators found that the right of a single shareholder to veto business transactions

---

[1] In their complaint, plaintiffs also asked for rescission of the merger, for the appointment of a receiver, for the dissolution of CDS, and for an accounting. Those claims are not in issue here. Only plaintiffs' claims for compensatory and punitive damages remain. The lawyers for CDS and Car Data were also named as defendants. Because we conclude that plaintiffs have no claim apart from an appraisal, the claims against the lawyers also may not be maintained.

trammeled the concept of corporate democracy. The veto was therefore eliminated. The general rule today is that decision-making by the majority must take precedence over the objection of a lone dissenter. *See* Revised Model Business Corporation Act § 13.02 (1984) (the "Model Act"); ORS 60.554(1).

The rejection of a minority veto and the recognition of majority rule has not occurred without regard for the potential abuses of a majority's power directed against minority interests. The linchpin of a dissenter's protection in merger cases is found in the statutory appraisal remedy. This remedy is designed to provide statutory protection to those minority shareholders who do not concur with the decision of the majority shareholders.

One device commonly used to eliminate minority shareholders who disagree with the majority shareholders about corporate decision-making is the cash-out merger. A typical cash-out merger, and the appraisal remedy, are described in 1 F.H. O'Neal & R. Thompson, O'Neal's Oppression of Minority Shareholders 21-22, § 5:04 (2d ed):

> "Controlling shareholders often utilize a statutory merger as an instrument for squeezing out minority shareholders or altering their rights and preferences. In every state the corporation statute provides a statutory procedure by which two or more corporations can be combined into a single corporation even though less than all shareholders approve. * * *
>
> "* * * * *
>
> "Under the typical procedure for merger, the directors of the combining companies adopt a plan of merger, which sets forth the terms and conditions of the merger, including the manner in which shares of each of the constituent corporations are to be converted into shares, obligations, or other securities of the surviving corporation, or into cash or other property. The board then submits the plan to the shareholders of each constituent corporation. Depending on the corporation statute in the particular jurisdiction, the plan must be approved by holders of a majority or another specified proportion of each company's shares or by holders of a majority or specified proportion of shares with voting rights. * * * If the plan receives the required approval, it is then filed in a specified public office. A shareholder who dissents from a merger can force the corporation in which he has held stock

or the surviving corporation, depending upon the statute, to purchase his shares at their appraised value." (Footnotes omitted.)

Undeniably, such mergers have a coercive element.

"Freezeouts, by definition, are coercive: minority stockholders are bound by majority rule to accept cash or debt in exchange for their common shares, even though the price they receive may be less than the value they assign to those shares. But this alone does not render freezeouts objectionable. Majority rule always entails coercion. It is, nonetheless, an acceptable rule of governance if all members of the voting constituency share a common goal and if all will be identically affected by the outcome of the vote. In the ordinary arm's-length merger negotiated by the managements of two unrelated corporations, stockholders of the merged entity are properly viewed as having a common interest in maximizing the returns on their stock, whether through periodic dividends or through sale or liquidation of the firm. Once approved by a statutory majority, the terms of such a merger will apply equally to each of the merging company's stockholders, and the common decision will satisfy the principle that all members of the class be treated alike. Majority rule is thus an appropriate means of deciding whether an arm's-length merger should be allowed, and it is of course a universal feature of the corporate law. Despite the element of coercion, dissenters to such a merger are bound, or remitted to an appraisal proceeding, by vote of a majority of their class, because it is assumed that any disagreement among the stockholders involves nothing more than a practical judgment about the best way to achieve a common aim." Brudney & Chirelstein, *A Restatement of Corporate Freezeouts*, 87 Yale LJ 1354, 1357-58 (1978).

The Oregon statutes that permit cash-out mergers, ORS 60.481 to 60.501, contain procedural protections for minority shareholders. ORS 60.554 provides in part:

"(1)   Subject to subsection (2) of this section, a shareholder is entitled to dissent from, and obtain payment of the fair value of the shareholder's shares in the event of, any of the following corporate acts:

"(a)   Consummation of a plan of merger to which the corporation is a party if shareholder approval is required for the merger by ORS 60.487 or the articles of incorporation and the shareholder is entitled to vote on the merger or if the

corporation is a subsidiary that is merged with its parent under ORS 60.491;

"(b) Consummation of a plan of share exchange to which the corporation is a party as the corporation whose shares will be acquired, if the shareholder is entitled to vote on the plan[.]"

Dissenters from a proposed merger have a right to demand payment for their shares. ORS 60.571. If they do so, the corporation is then required to pay each dissenter "the fair value of the shareholder's shares, plus accrued interest." ORS 60.577(1). If the parties do not agree as to fair value for the shares, the corporation "shall commence a proceeding * * * to determine the fair value of the shares and accrued interest." ORS 60.591(1). A court then determines the fair value of the shares. The appraisal procedure is the sole remedy for dissenting shareholders in the absence of "unlawful or fraudulent" conduct. ORS 60.554(2) provides:

"A shareholder entitled to dissent and obtain payment for the shareholder's shares under ORS 60.551 to 60.594 may not challenge the corporate action creating the shareholder's entitlement unless the action is unlawful or fraudulent with respect to the shareholder or the corporation."

Plaintiffs brought this action, claiming that defendants acted unlawfully incident to the transfer of CDS shares to Car Data, squeezing out plaintiffs. The trial court granted defendants' motions to dismiss for failure to state a claim. ORCP 21A(8).

Plaintiffs' complaint alleges that plaintiffs Stringer and Schubert and two other shareholders owned 43 percent of the shares of CDS. Thirty-two individuals, including the six directors of CDS, owned the remaining 57 percent of CDS. According to the complaint, "[i]n late 1988 or early 1989, the CDS Directors and the larger CDS shareholders, Donald Smith, Mark Kallenberger and Lawrence Custer * * *, decided to squeeze the Minority Shareholders out of their ownership in CDS and to offer them a nominal sum for their stock, which sum was significantly below the fair market value of the stock." The directors and larger shareholders formed a new company that subsequently became Car Data, transferred their shares in CDS to Car Data in exchange for its stock, and solicited all the remaining shareholders, except

for the four minority shareholders, to participate in their plan. A total of 32 CDS shareholders transferred their stock, amounting to 57 percent of the CDS shares, to Car Data. Car Data shareholders then voted for a merger between Car Data and CDS. Pursuant to the merger proposal, each CDS shareholder would receive $0.002 per share. As owner of 57 percent of CDS, Car Data voted for the merger. The merger was approved over the objections of plaintiffs and two other minority shareholders.

Plaintiffs claimed that their shares were worth at least $0.10 per share and refused to accept the $0.002 offered them. Car Data rejected plaintiffs demand for $0.10 per share and instituted an appraisal proceeding in the circuit court pursuant to ORS 60.591.[2] Plaintiffs instituted this action in the circuit court against Car Data, CDS, the 32 individual former shareholders of CDS and the present shareholders of Car Data (the shareholder defendants), and the lawyers who represented both CDS and Car Data during the merger process. Plaintiffs' complaint contained three claims for relief: (1) a claim for breach of fiduciary duty against all defendants,[3] in which they prayed for rescission of the merger and appointment of a receiver, or, alternatively, for compensatory damages[4] and an award of punitive damages against Car Data and the shareholder defendants; (2) a claim for civil conspiracy against all defendants, in which they sought compensatory damages and punitive damages against Car Data and the shareholder defendants; and (3) a derivative claim against the former directors of CDS for failing to obtain the best price for all shareholders.

The circuit court stayed the proceedings in the present case pending trial of the appraisal case. The appraisal

---

[2] ORS 60.591(1) provides in part:

"If a demand for payment under ORS 60.587 remains unsettled, the corporation shall commence a proceeding within 60 days after receiving the payment demand under ORS 60.587 and petition the court under subsection (2) of this section to determine the fair value of the shares and accrued interest."

[3] All references to "defendants" or "all defendants" exclude nominal defendants Perry and Kargman, the two other minority shareholders of CDS.

[4] Plaintiffs sought damages based on what their 28.6 percent ownership interest would have been worth at the time of trial, *i.e.*, what the value of their stock would have been if they had not been cashed out in the merger.

case was concluded, and this case then proceeded.[5]

Defendants moved to dismiss plaintiffs' claim on the grounds that (1) plaintiffs' sole remedy is under the appraisal procedure, and (2) even if appraisal is not the sole remedy, plaintiffs' complaint "fail[s] to state facts to support a claim for relief * * * for breach of fiduciary duty." The circuit court dismissed plaintiffs' complaint.

Plaintiffs appealed, pursuing their damages claims on theories of breach of fiduciary duty and civil conspiracy, but abandoned their derivative claim and rescission claim. The Court of Appeals affirmed. *Stringer v. Car Data Systems, Inc., supra,* 108 Or App at 527-28; *id.,* 110 Or App at 17 (on reconsideration).

Because this case comes to us on appeal of an order of dismissal, we must determine whether the complaint states a claim. In considering the sufficiency of plaintiffs' complaint, we accept all well-pleaded allegations of the complaint as true and give plaintiffs the benefit of all favorable inferences that may be drawn from the facts alleged. *Madani v. Kendall Ford, Inc.,* 312 Or 198, 201, 818 P2d 930 (1991). We quote pertinent portions of plaintiffs' complaint:

"12.

"Throughout 1988 and into 1989, CDS experienced continued success in selling its product. Its revenues during this period were increasing at a much faster rate than its expenses. All shareholders had a reasonable belief that the value of CDS would rise significantly over the next few years.

"13.

"In late 1988 or early 1989, the CDS Directors and the larger CDS shareholders, Donald Smith, Mark Kallenberger and Lawrence Custer (collectively referred to herein as the 'Controlling Shareholders'), decided to squeeze the Minority Shareholders out of their ownership in CDS and to offer them a nominal sum for their stock, which sum was significantly below the fair market value of the stock (the 'Plan'). The principal purpose of the Plan was to deprive the Minority Shareholders of most of the present value of their stock in

---

[5] The Court of Appeals affirmed the judgment of the circuit court in the appraisal action. *Chrome Data Systems, Inc. v. Stringer,* 109 Or App 513, 820 P2d 831 (1991). Car Data had changed its name to Chrome Data Systems, Inc. after this action was brought, but before it instituted the appraisal proceeding.

CDS and to deprive the Minority Shareholders of their share of the anticipated significant rise in the value of CDS stock over the next few years.

"* * * * *

"24.

"Throughout April 1989, while all defendants were carrying forth the Plan to squeeze out the Minority Shareholders, all defendants knew the $0.002 per share to be offered the Minority Shareholders was grossly less than the present fair market value of the shares.

"25.

"Throughout April 1989, while all defendants (except Kargman and Perry) were carrying forth the Plan to squeeze out the Minority Shareholders, all such defendants believed that the value of the CDS stock would greatly increase over the next few years, based on the increased business sales and profitability of CDS.

"26.

"In early 1989, CDS received an offer from a third party to purchase substantially all of the corporation's assets. This offer was at a price substantially·greater than $0.002 per share.

"27.

"At a shareholders' meeting on February 6, 1989, the shareholders voted to reject this offer. All of the Majority Shareholders voted to reject this offer."

The thrust of plaintiffs' claims here is this (quoting from their brief):

"The majority shareholders owe a duty of loyalty, good faith, fair dealing, and full disclosure to the minority shareholders. This duty is breached when the majority transfers corporate assets to themselves and offers the minority a mere fraction of the true value of their shares."

As stated above, ORS 60.554(2) provides that a dissenting shareholder "may not challenge the corporate action creating the shareholder's entitlement unless the action is unlawful or fraudulent with respect to the shareholder or the corporation." The dispositive question here is whether plaintiffs have alleged facts that would establish that defendants' conduct was "unlawful or fraudulent" within the meaning of ORS 60.554(2).

We start with the observation that this court may not question the wisdom of the Legislative Assembly in enacting the Oregon Business Corporation Act. That law drew upon the Model Business Corporation Act and contains procedures for majority shareholders to "squeeze out" minority shareholders. The legislative decision involved considerations affecting both majority shareholders and dissenting shareholders.

> "The accompanying proposals as a whole are designed to benefit both minority shareholders and controlling shareholders. Minority shareholders benefit because the assertion of their rights is made easier, and penalties are introduced for vexatious obstruction by corporate management. Controlling shareholders benefit directly and indirectly. They benefit directly by the added incentives for dissenters to settle without a judicial appraisal. They benefit indirectly because the provision of an adequate appraisal right diminishes the justification for courts to enjoin or set aside corporate changes because of the absence of an 'adequate remedy at law,' or because the corporate action 'would operate as a fraud.' " Conard, *Amendments of Model Business Corporation Act Affecting Dissenters' Rights (Sections 73, 74, 80, and 81)*, 33 Bus Law 2587, 2593 (1978).

In order to decide whether plaintiffs have a claim in addition to their rights under the appraisal procedure statutes, we must look more closely at those statutes. After both corporations have "consummated" a plan of merger, ORS 60.487, the appraisal procedures of ORS 60.551 to 60.594 may be invoked by dissenting shareholders. The procedures are:

First, a dissenting shareholder must give notice of intent to demand payment for his or her shares, ORS 60.564(1), and then demand payment and deposit the share certificates, ORS 60.571. The surviving corporation is required to "pay each dissenter * * * the amount the corporation estimates to be the fair value of the shareholder's shares, plus accrued interest." ORS 60.577(1). The payment must be accompanied by the "corporation's balance sheet," a "statement of the corporation's estimate of the fair value of the shares," and "explanation of how the interest was calculated," a "statement of the dissenter's right to demand

payment under ORS 60.587," and a "copy of ORS 60.551 to 60.594." ORS 60.577(2).

A dissenter who is dissatisfied with the price paid may notify the corporation and demand payment of the dissenter's estimate of the shares' "fair value."[6] ORS 60.587. The corporation must then do one of three things: (1) not go forward with the merger, (2) pay the estimate to the shareholder, or (3) commence a proceeding in the circuit court to determine the fair value of the shares and accrued interest. ORS 60.587, 60.591.

In circuit court appraisal proceedings, dissenting shareholders who have been paid less than fair value of their shares by the corporation are entitled to a court award of the difference between the amount paid by the corporation and the fair value of the shares, plus interest. With exceptions not relevant here, the corporation also is required to pay "all costs of the proceeding, including the reasonable compensation and expenses of appraisers appointed by the court." ORS 60.594(1), 60.591(5)(a).

In addition, dissenters are entitled to "fees and expenses of [their] counsel and experts" if (1) "the corporation did not substantially comply with * * * ORS 60.561 to 60.587," *or* (2) the corporation "acted arbitrarily, vexatiously or not in good faith with respect to the rights provided by this chapter." ORS 60.594(2).

Under ORS 60.591(5), a dissenting shareholder is entitled to payment for that which has been taken, the fair value of the stock. In determining the fair value of a stock immediately before the merger, many factors are relevant, including, but not limited to, the following:[7] the price at which the shares had been selling; the amount, if any, of

---

[6] ORS 60.551(4) defines "fair value" as follows:

" 'Fair value,' with respect to a dissenter's shares, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable."

[7] ORS 60.554(3) excludes cases involving shares "registered on a national securities exchange or prices * * * quoted on the National Association of Securities Dealers, Inc. Automated Quotation System as a National Market System."

present share value increase or decrease because of anticipated future earnings of the corporation; corporate assets; corporate earnings or losses; corporate reputation; anticipated competition. ORS 60.551(4) excludes consideration of appreciation or depreciation in anticipation of the corporate action, unless it would be inequitable to exclude such appreciation or depreciation.

The fair value of corporate stock may be more or less than the sum of the parts of the corporation, depending on a host of factors. In determining the fair value of stock in a closely held corporation, ORS 60.551(4), the court's responsibility and authority is similar to that of a judge in a tax case or a domestic relations case involving the fair market value of stock of a corporation. In short, the court should take into account all relevant factors.[8]

■ Plaintiffs' complaint in this case alleged neither fraud nor misleading representations that were relied upon by plaintiffs. From plaintiffs' complaint, one can infer only that the amount paid by CDS was unfair and unreasonably low, in an attempt to avoid paying fair value to plaintiffs for their shares.

■ Cases such as this are the very kind addressed by the statutory scheme. With the exception of punitive damages, every element of damages that plaintiffs seek herein is recoverable under ORS 60.551 to 60.594. The complaint contains no allegations of fact that, if proved, would support a punitive damages award.[9] The legislative plan expressly provides for

---

[8] The Delaware court has held that "fair value * * * includes any damages, resulting from the taking, which the stockholders sustain as a class. If that was not the case, then the obligation to consider the [statutory obligation to take into account] 'all relevant factors' in the valuation process would be eroded." *Weinberger v. UOP, Inc.*, 457 A2d 701, 713 (Del 1983). Although the Delaware statute, Del C § 262(h), is not identical to ORS 60.551(4), and expressly includes "all relevant factors," it is reasonable to include those factors by implication. We need not and do not decide, in this case, what damages claims other than those asserted by plaintiffs herein would be permissible under ORS 60.551(4).

[9] In support of their punitive damages claim, plaintiffs allege that the acts of defendants, set forth in the text above, 314 Or at 584-85, "were wanton misconduct amounting to a deliberate disregard of the rights of the plaintiffs, entitling plaintiffs to an award of punitive damages."

"[I]f punitive damages are sought, facts must be alleged which, if proved, will establish the right to recover punitive damages." *Davis v. Tyee Industries, Inc.*, 295 Or 467, 477, 668 P2d 1186 (1983). A mere recitation that a defendant's conduct was

recovery of attorney fees and expenses and of expert fees and expenses for arbitrary or vexatious action, or actions "not in good faith" in connection with the cash-out merger. *See* 60.594(1) and (2). This provision suggests to us that the legislature intended that, *even if* the corporation offers too little money to the dissenters for their shares "arbitrarily, vexatiously or not in good faith," ORS 60.594(2), and if the disagreement is solely as to the value of the shares, statutory appraisal is the exclusive remedy.[10]

The last clause of ORS 60.551(4) also is significant. To the extent, if any, that plaintiffs seek damages for "any appreciation or depreciation in anticipation of the corporate action," those damages can be considered if "exclusion would be inequitable." We agree with the Delaware Supreme Court that "there is a legislative intent to fully compensate shareholders for whatever their loss may be, subject only to the narrow limitation that one can not take speculative effects of the merger into account." *Weinberger v. UOP, Inc.*, 457 A2d 701, 714 (Del 1983).

> " 'Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value.'
>
> "This is not only in accord with the realities of present day affairs, but it is thoroughly consonant with the purpose and intent of our statutory law." *Id.* at 713 (quoting *Tri-Continental Corp. v. Battye*, 74 A2d 71, 72 (Del 1950)).

---

wanton or malicious is a mere conclusion of the pleader. "Where punitive damages are sought, the complaint should set forth the ultimate facts which are claimed to support the recovery of punitive damages." *Id.* at 479; *accord: Holden v. Pioneer Broadcasting Co.*, 228 Or 405, 418, 365 P2d 845 (1961).

[10] Where the dissenting shareholders vote for the merger or surrender their shares as a result of misrepresentation or fraud, they may bring a separate action for damages. *See Weinberger v. UOP, Inc., supra* note 8, and *Rabkin v. Philip A. Hunt Chemical Corp.*, 498 A2d 1099 (Del 1985). No such claims are made in this case.

In *Weinberger*, the Delaware court also stated:

> "But elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered." *Id.* at 713.

■ Plaintiffs' complaint clearly alleges a disagreement as to valuation, and we also can infer payment by Car Data of an unreasonably low price. Where the allegations show only a disagreement as to price, however, with no allegations that permit any inference of self-dealing, fraud, deliberate waste of corporate assets, misrepresentation, or other unlawful conduct, the remedy afforded by ORS 60.551 to 60.594 is exclusive. That is true even if the majority shareholders acted arbitrarily or vexatiously or not in good faith. *Stepak v. Schey*, 51 Ohio St 3d 8, 553 NE2d 1072, 1075 (1990) (remedy for breach of fiduciary duty involving only the price that a shareholder receives is limited to appraisal statute); *Schloss Associates v. C & O Ry.*, 73 Md App 727, 536 A2d 147, 158 (1988) ("What we have then is essentially a complaint over price — the amount and how it was established — for which the statutory appraisal right is a wholly adequate remedy."); *Green v. Santa Fe Industries, Inc.*, 70 NY2d 244, 514 NE2d 105, 112 (1987) ("Here, * * * all of the actions with which defendant corporations are charged relate to price; there are no claims asserted against individual defendants based on dual representation; and it cannot be said that the 'defendants are charged with bad faith which goes beyond issues of "mere inadequacy of price." *Cole v. National Cash Credit Association* [18] Del. Ch. [47], 156 A 183, 187-88 [1931]' ").[11]

It may be that the $0.002 offer was insulting to plaintiffs, and it may even have been motivated by bad faith. But, because the facts alleged in the complaint, if established, support no claim for damages apart from the fair value of the

---

[11] *Green v. Santa Fe Industries, Inc.*, upholds cash-out mergers motivated solely to freeze out minority shareholders. In *Weinberger v. UOP, Inc., supra* note 8, the Delaware court abandoned the "business purpose" rule — requiring that a cash-out merger have some business purpose and was *not* merely for the purpose of squeezing out the minority shareholders — that it had adopted in 1977. Other courts still require that a parent-subsidiary merger serve a business purpose. *E.g., Coggins v. New England Patriots Football Club*, 397 Mass 525, 492 NE2d 1112, 1118 (1986). No such issue is presented here, and we express no opinion on that issue.

shares, we believe that the legislature intended that dissenting shareholders in the position of plaintiffs be limited to their remedies under the appraisal statutes.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

**UNIS, J.,** concurring in part, dissenting in part.

The issue in this case is whether plaintiffs' complaint states a claim for breach of fiduciary duty and civil conspiracy. I cannot agree with the majority's holding that plaintiffs' complaint fails to state a claim under either theory. I would hold that plaintiffs' complaint states a claim for breach of fiduciary duty and civil conspiracy against all defendants[1] except defendant attorneys.[2] I agree with the majority that the complaint does not state a claim against defendant attorneys. I, therefore, concur in part and dissent in part.

Because plaintiffs' complaint was dismissed for failure to state a claim pursuant to ORCP 21 A(8),[3] this court must accept the allegations in the complaint as "true," *Madani v. Kendall Ford, Inc.*, 312 Or 198, 201, 818 P2d 930 (1991), and as "facts," *Nicholsen v. Blachly*, 305 Or 578, 580, 753 P2d 955 (1988). Moreover, as the majority recognizes, we must give plaintiffs the benefit of all favorable inferences that may be drawn from the allegations. 314 Or at 584. Applying these principles, the following seems to be a fair summary of those pleaded "facts" and favorable inferences to be drawn therefrom.

Plaintiffs Stringer and Schubert and three others founded CDS in 1986. Stock was sold in the corporation until, in 1989, there were 36 shareholders. Stringer and Schubert,

---

[1] Elizabeth A. Perry and James B. Kargman are named as nominal defendants. Both were CDS shareholders who were not solicited to transfer stock to Car Data and did not vote for the merger.

[2] Defendant attorneys are Richard M. Botteri and Weiss, Descamp & Botteri, an Oregon professional corporation. In the complaint, plaintiffs allege only that the controlling shareholders of CDS retained legal services to "assist them in squeezing out the Minority Shareholders." The complaint does not state, and it cannot be inferred from the complaint, that the attorneys were made aware that the purpose of the merger was to temporarily devalue CDS's stock in order to capture for the majority shareholders some of the true value of the minority shareholders' stock. It is not unlawful simply to assist in an otherwise legitimate squeeze-out merger.

[3] The trial court also denied plaintiffs' leave to replead.

along with the two nominal defendants in this case, retained about 43 percent of the stock. The stock was sold at about 10 cents a share during this period.

According to the complaint, CDS was successful during this period, and revenues were increasing faster than expenses. In early 1989, again according to the complaint, a third party made a written offer to purchase CDS at a price substantially above what was subsequently offered during the "squeeze-out" merger at issue here. CDS, by vote of the majority of shareholders, rejected the third party's offer.

The complaint alleges the following:

"In late 1988 or early 1989, the CDS Directors and the larger CDS shareholders, Donald Smith, Mark Kallenberger and Lawrence Custer (collectively referred to herein as the 'Controlling Shareholders'), decided to squeeze the Minority Shareholders out of their ownership in CDS and to offer then a nominal sum for their stock, which sum was significantly below fair market value of the stock (the 'Plan'). *The principal purpose of the Plan was to deprive the Minority Shareholders of most of the present value of their stock in CDS* and to deprive the Minority Shareholders of their share of the anticipated significant rise in the value of CDS stock over the next few years." (Emphasis added.)

The complaint goes on to allege that the directors and the three larger majority shareholders, whom plaintiffs describe in their complaint as the "Controlling Shareholders," retained defendant attorneys to incorporate a new corporation, Car Data, as the vehicle for the completion of this plan.

The complaint also alleges that, in furtherance of the plan, the CDS directors and the "Controlling Shareholders" transferred all their CDS stock to Car Data and then solicited the participation of all CDS shareholders except plaintiffs and the two nominal defendants. Once Car Data had obtained by these means a majority of the stock of CDS, a merger was proposed between CDS and Car Data.

As majority shareholder of CDS, Car Data approved the merger with a stock value of $0.002 per share, a price far below that previously offered by the third party. The stockholders of Car data, *i.e.*, the board of directors of CDS and all the former shareholders of CDS except plaintiffs and the two

nominal defendants, also approved the merger. Plaintiffs allege that, as a result of this vote, the minority shareholders received $9,900 for stock with a fair market value of $290,000.

## BREACH OF FIDUCIARY DUTY CLAIM

In plaintiffs' claim for breach of fiduciary duty, plaintiffs allege that the above acts by the directors, the collective majority of CDS shareholders and Car Data, constitute a breach of their fiduciary duty to the minority shareholders, including plaintiffs. Plaintiffs seek, *inter alia*, rescission of the merger or, in the alternative, damages equal to the fair market value of plaintiffs' proportionate share of defendant Car Data on the date of trial, plus punitive damages.

The majority holds that the allegations in plaintiffs' complaint "show only a disagreement as to price" and do not "permit any inference of self-dealing, fraud, deliberate waste of corporate assets, misrepresentation, or other unlawful conduct." 314 Or at 590. The majority concludes that plaintiffs have no claim against defendants apart from their remedy under the appraisal statutes, ORS 60.551 to 60.594. This conclusion, in my judgment, ignores allegations that we must accept on an ORCP 21 A(8) motion as "true" pleaded "facts," and it ignores inferences favorable to plaintiffs that may be drawn from those allegations.

In 1987, the legislature adopted the Revised Model Business Corporation Act (RMBCA) sections 13.30 and 13.31, Or Laws 1987, ch 52, §§ 136 and 137, except for modifications necessary to conform to Oregon's judicial system. *See* Report of the Revised Model Business Corporation Act Task Force of the Business Law Section of the Oregon State Bar 63 (March 24, 1987). The sections became ORS 60.591 and ORS 60.594. These statutory provisions provide a dissenting shareholder with an appraisal remedy to secure "fair value" for shares in the event of a corporate act resulting in a merger.

The statutory provisions relating to the appraisal procedure are subject to ORS 60.554(2) and must be read in conjunction with that provision. ORS 60.554(2), which is taken from RMBCA section 13.02(b), provides that a dissenting shareholder "may not challenge the corporate action

creating the shareholder's entitlement *unless the action is unlawful or fraudulent with respect to the shareholder or the corporation.*" (Emphasis added.) The explanation for the exception provided for in ORS 60.554(2) is that "the prospect that shareholders may be 'paid off' [through the appraisal procedure] does not justify the corporation in proceeding unlawfully or fraudulently." Official Comment to RMBCA section 13.02 at 1366 in 3 Model Business Corporation Act Annotated (3d ed, 1992 Supp).

Although the type of "unlawful" or "fraudulent" conduct required by ORS 60.554(2) to overcome the exclusive remedy of appraisal is not precisely defined, the Official Comment to RMBCA section 13.02 provides guidance. The Official Comment states:

> "Because of the variety of situations in which unlawfulness and fraud may appear, this section makes no attempt to specify particular illustrations. Rather, it *is designed to recognize and preserve the principles that have developed in the case law of Delaware, New York and other states with regard to the effect of dissenters' rights on other remedies of dissident shareholders.*" *Id.* at 1367 (emphasis added).

Thus, "[i]f the corporation attempts an action in violation of the corporation law on voting, in violation of clauses in articles of incorporation prohibiting it, by deception of shareholders, or in violation of a fiduciary duty," it cannot later hide behind the appraisal remedy provision of the RMBCA. *Id.* at 1366.

The Official Comment to RMBCA section 13.02(b) singles out *Weinberger v. UOP, Inc.*, 457 A2d 701 (Del Supr 1983), as an example of the case law that section 13.02(b) was designed to recognize and preserve. *Id.* at 1367. *Weinberger* recognizes that the statutory appraisal remedy may not be adequate, "particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets or gross and palpable overreaching are involved." *Weinberger v. UOP, Inc., supra,* 457 A2d at 714. Post-*Weinberger* Delaware decisions clearly recognize that appraisal rights are not the exclusive remedy in the face of allegations of misconduct.

In *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A2d 1324 (Del Ch 1987), the Delaware Court of Chancery

held that the minority shareholders were entitled to a preliminary injunction enjoining a squeeze-out merger. According to the court, "[a]s fiduciaries seeking to 'cash out' the minority stockholders of a Delaware corporation in a non-arm's length merger, the defendants had a duty to be entirely and scrupulously fair to the plaintiffs in all respects." *Id.* at 1335 (citing *Weinberger v. UOP, Inc., supra,* 457 A2d at 710). The Delaware court was concerned that the majority stockholder not be allowed to "time or structure the transaction, or to manipulate the corporation's values, so as to permit or facilitate the forced elimination of the minority stockholders at an unfair price." *Id.*

In *Sealy Mattress,* the court noted that the corporation's directors "were obliged to make an informed, deliberate judgment, in good faith, that the merger terms, including the price, were fair and that the merger would not become a vehicle for economic oppression." *Id.* Moreover, noted the Delaware court, "the directors (and the majority stockholder, to the extent that it involved itself in such matters) were obliged to disclose with entire candor all material facts concerning the merger, so that the minority stockholders would be able to make an informed decision as to whether to accept the merger price or to seek judicial remedies such as appraisal, an injunction, or a post-merger damage action." *Id.*

As in *Sealy,* none of the fiduciary obligations owed by corporate directors and majority shareholders were satisfied in this case.[4] Plaintiffs Stringer and Schubert alleged that the directors of CDS, acting with three certain larger CDS shareholders, developed a plan to squeeze out plaintiffs for a nominal sum, a sum significantly below the fair market value of plaintiffs' shares. The squeeze-out merger was implemented just after the majority shareholders had rejected a third-party offer to purchase substantially all of CDS assets at a price substantially greater than the $0.002 per share price set in the squeeze-out merger. The squeeze-out merger would have permitted the majority shareholders, which

---

[4] It is unclear at this preliminary stage which, if any, of the defendants exercised majority shareholder control. Nevertheless, the allegation that the directors and the three larger CDS shareholders worked in concert to control CDS, together with the other allegations in plaintiffs' complaint, are sufficient to state a claim against those shareholders.

includes the six directors of CDS, to sell the CDS assets at this higher price without sharing any of the proceeds with the minority shareholders.

Such conduct by directors and the large shareholders does not meet duties of good faith and fair dealing imposed by Oregon law. *See, e.g., Zidell v. Zidell, Inc. (24128),* 277 Or 413, 418, 560 P2d 1086 (1977) ("those in control of corporate affairs have fiduciary duties of good faith and fair dealing toward minority shareholders"); ORS 60.357 (requiring a director to discharge the duties of the office "in good faith"); ORS 60.361 ("[a] conflict of interest transaction is a transaction with the corporation in which a director of the corporation has a direct or indirect interest"). With respect to the minority shareholders of CDS and, in particular, plaintiffs, the allegations of the complaint are, in my view, sufficient to permit an inference of self-dealing and gross, palpable, overreaching conduct — a violation of the fiduciary duty owed to plaintiffs by CDS directors and majority shareholders.[5] As such, the case should not have been dismissed at the pleading stage for failure to state a claim.

The majority admits that "[p]laintiffs' complaint clearly alleges a disagreement as to valuation, and we also can infer payment by Car Data of an *unreasonably low price.*" 314 Or at 590 (emphasis added). The majority, however, concludes that the *only* complaint plaintiffs make is the price of CDS's stock. *Id.* That interpretation ignores the means by which that price was alleged to have been determined, and who made that determination.

According to the allegations in plaintiffs' complaint and to inferences favorable to plaintiffs that may be drawn from those allegations, the directors of CDS hatched a plan to capture some of the corporation's stock at a bargain. This action, again taken from the complaint, was undertaken immediately following a purchase offer that these same directors, in their official capacity, had rejected. The inference drawn is that the directors of CDS, realizing the value of their stock, determined to capture as much of that value as possible

---

[5] Once the directors and the three larger shareholders of CDS transferred their stock to Car Data, it became the single majority shareholder in CDS.

for themselves. To do so, however, they needed to create a majority voting block.

To that end, the complaint alleges, the directors formed a paper corporation that had no assets whatsoever. The directors then transferred their CDS stock to the new corporation, Car Data. The complaint alleges that the *purpose* of the new corporation was to deprive a minority of the shareholders of CDS stock of the value of that stock. Surely the majority does not mean to hold that it is lawful for the directors of a corporation to plot unlawfully against some of the corporation's shareholders as long as those shareholders can subsequently defeat the unlawful plot through judicial action to determine the fair value of the company's stock. Yet that is the effect of the majority's holding.

I believe that the complaint alleges a breach of the fiduciary duty that the directors of CDS owed to plaintiffs as shareholders of CDS. The complaint does not allege that the directors wanted to "squeeze out" minority shareholders for the benefit of the corporation; it alleges that they conspired to steal some or most of the value of their stock by using a pseudo squeeze-out merger.[6] Car Data, the majority shareholder of CDS, was the vehicle used to accomplish that goal. The other shareholders who then joined the directors are implicated in the same misconduct.[7] Though they may not, as the majority states, have owed plaintiffs a fiduciary duty as shareholders, it nonetheless would be unlawful for them to conspire with the directors of the corporation to increase the value of their stock by creating a paper corporation with the intent to devalue temporarily the corporation's stock.

The inference fairly drawn from the complaint is that there was no "merger" in this case to which one could apply an appraisal remedy. Car Data, the complaint alleges, was no more than the alter ego of CDS's own directors and

---

[6] The majority recognizes that, in certain circumstances, such as a parent-subsidiary merger, courts may require that a cash-out merger have some business purpose, not just be undertaken to squeeze out minority shareholders. *See* 314 Or at 590 n 11. In this case, not only is there no business purpose for the merger of two corporations that share directors and majority shareholders, but the merger is alleged to be for the sole purpose of depriving the minority shareholders of one corporation of the value of their stock.

[7] *See, infra*, "Civil Conspiracy Claim."

several of its largest shareholders. Its purpose, again according to the complaint, was to create a majority voting block to devalue the corporation's stock.

Had the three larger majority shareholders ("Controlling Shareholders") conspired with the CDS directors to reject a legitimate purchase offer and then sold all CDS's assets to Car Data at far below market value so that they could resell Car Data at a windfall price, I do not believe that the majority would find it as difficult to find "overreaching." Yet, in this case, an allegation that certain shareholders and the directors of CDS created a paper corporation in order to accomplish the same result through a "merger" is considered insufficient. I do not believe that the drafters of the RMBCA or the Oregon legislature intended to create a vehicle for this kind of business practice simply because they wished to facilitate legitimate business mergers when there is a disagreement among shareholders over the *wisdom* of the merger.

In *Joseph v. Shell Oil Co.*, 498 A2d 1117, 1122 (Del Ch 1985), the Delaware Court of Chancery cautioned:

> "Because all inferences in the allegations in a complaint must be construed in favor of the plaintiffs, and because each suit is unique, complaints asserting a claim of unfair dealing as to a tender offer or freeze-out merger must be read carefully to determine if an appraisal will provide an adequate remedy if the claims prove to be true. Great care must be taken not to unjustifiably relegate objecting stockholders to an appraisal proceeding because to do so might have the result of precluding the imposition of an adequate remedy for serious breaches of fiduciary duty."

Appraisal actions are exclusive remedies only when the disagreement is over whether or not to accept an otherwise legitimate merger offer. When that is not the case, other courts allow actions to be pursued apart from an appraisal statute. *See, e.g., Rabkin v. Phillip A. Hunt Chemical Corp.*, 498 A2d 1099 (Del Supr 1985); *Coggins v. New England Patriots Football Club, Inc.*, 397 Mass 525, 492 NE2d 1112 (1986); *Edelman v. Fruehauf Corp.*, 798 F2d 882, 886-87 (6th Cir 1986); *Stepak v. Schey*, 51 Ohio St 3d 8, 553 NE2d 1072 (1990).

## CIVIL CONSPIRACY CLAIM

Plaintiffs' complaint, in my opinion, also states a claim for civil conspiracy. In *Bonds v. Landers*, 279 Or 169, 566 P2d 513 (1977), this court upheld a judgment based on a theory of civil conspiracy,[8] stating:

> " 'A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means.' 15A CJS 596, Conspiracy § 1(1), citing *Bliss v. Southern Pacific Co.*, 212 Or 634, 321 P2d 324 (1958); *Pitts v. King*, 141 Or 23, 15 P2d 379, [*modified* 141 Or 35,] 15 P2d 472 (1932)." 279 Or at 174.

Plaintiffs allege that defendants adopted a "plan" to deprive plaintiffs of the value of their stock. The underlying wrongful act was the breach of fiduciary duty by the directors and the collective majority of shareholders. Thus, the "concerted action" or "plan" of defendants to accomplish this unlawful act constitutes civil conspiracy.

## CONCLUSION

In sum, I concur in that part of the majority's opinion that holds that plaintiffs' complaint fails to state a claim for breach of fiduciary duty and civil conspiracy against defendant attorneys. As against all other defendants, however, plaintiffs' complaint alleges facts that, if proved and considered along with favorable inferences to be drawn therefrom, would establish their right to recover for breach of fiduciary duty and civil conspirary. I would hold, therefore, that defendants' ORCP 21 A(8) motions should have been denied, except as to defendant attorneys.

Fadeley, J., joins in this opinion.

---

[8] In *Bonds*, this court cited with favor the elements of civil conspiracy as set out in 15A CJS 599, Conspiracy § 1(2). Those elements are: "(1) Two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Bonds v. Landers*, 279 Or 169, 174, 566 P2d 513 (1977).